110 F.3d 65
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Keith LOWE, Defendant-Appellant.
 No. 95-4097, 96-3894.
 United States Court of Appeals, Sixth Circuit.
 April 4, 1997.
 
 Before: KENNEDY, KRUPANSKY, and NORRIS, Circuit Judges.
 KENNEDY, Circuit Judge.
 
 
 1
 In these consolidated appeals, defendant appeals his conviction and sentence for conspiracy to possess with the intent to distribute cocaine base, commonly referred to as "crack cocaine" or "crack." Asserting that the District Court improperly allowed the introduction of a shotgun as evidence at his trial, defendant requests a new trial. He also argues that the District Court overestimated the amount of drugs attributable to him for sentencing purposes, and improperly enhanced his sentence due to his use of a dangerous weapon during the offense and his role as a supervisor of the drug conspiracy. Finally, defendant appeals the denial of his motion for new trial based upon newly discovered evidence. For the following reasons, we AFFIRM the conviction and sentence of defendant and the denial of his motion for a new trial.
 
 I.
 
 2
 On February 28, 1995, a federal grand jury indicted defendant for one count of conspiracy to possess with the intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The grand jury also indicted Supreena Smith, Patricia Gilmore, and Saleena Thorn on identical and related drug counts.
 
 
 3
 Codefendants, Gilmore and Thorn, pleaded guilty pursuant to plea agreements with the government and testified in detail regarding drug activities in which they participated with defendant and Smith from April of 1994 until their arrests on December 11, 1994. In particular, they testified that, during the time period at issue, Gilmore and defendant sold crack cocaine from various houses in Steubenville, Ohio. They also testified that defendant would travel to Aliquippa, Pennsylvania in order to buy crack, which he would bring back with him to Steubenville in order to prepare and sell.
 
 
 4
 Gilmore and Thorn described a trip they made with defendant to Aliquippa on December 9, 1994. The purpose of the trip was to buy more crack and pick up Smith, who lived in Pennsylvania. When Smith walked to their car, she was carrying a sawed-off shotgun wrapped in a gown, which defendant placed in the trunk. Gilmore and Thorn both testified that defendant explained to them that the gun was his and that he had instructed Smith to bring it so that he could use it for protection during their drug dealings. Although they were unable to purchase crack that evening, they returned to Pennsylvania the next night and bought four ounces.
 
 
 5
 Several police officers also testified at trial. Their testimony revealed in part that, on December 11, 1994, government informant Tamara Toudle made two controlled purchases of crack from Gilmore at a home located on 810 South Street in Steubenville. Based on these purchases, the police executed a search warrant at the house. When they entered, defendant, Smith, Thorn and Gilmore all were present; after defendant and Gilmore unsuccessfully attempted to flee, the police arrested all four individuals. After a search of the house, which one officer described upon cross-examination as "thorough," the police confiscated part of an ounce of crack, a scale, a pager, cash, and two knives.
 
 
 6
 During cross-examination, officer Anthony Adriano testified that investigative reports compiled by the police did not refer to defendant until November, 1994, even though the police began to monitor the drug activities of Thorn and Gilmore in April, 1994.
 
 
 7
 Two informants, William Green and Tamara Toudle, also testified. Green testified about the drug activities of Gilmore, Thorn, and defendant. Although he stated that Gilmore sold most of the drugs, Green indicated that defendant had sold drugs to him once or twice. Toudle, the cousin of defendant, offered similar testimony, stating that defendant sold her drugs on one occasion. She also testified, however, that she saw defendant preparing and packaging crack and counting drug funds at various crack houses. Toudle further stated that defendant and Gilmore sold drugs out of her house at one time.
 
 
 8
 The weekend before trial, and six months after the arrests, Gilmore and Thorn told the police that if they returned to the house at 810 South Street, they still could find the shotgun and the three ounces of unrecovered crack which Gilmore had purchased in Pennsylvania on December 10, 1994. Defendant asserts that Gilmore then telephoned the then-current occupant of the residence. When police arrived at the house, the occupant greeted them at the door and turned over a sawed-off shotgun approximately two feet in length. The police could not locate the three ounces of crack.
 
 
 9
 At trial, the District Court admitted into evidence the shotgun recovered by the police. Both Thorn and Gilmore identified the gun as the weapon which Smith gave to defendant on December 9, 1994. Defendant objected to the admission of the weapon, arguing that there was no reliable evidence of its authenticity.
 
 
 10
 On May 26, 1995 the jury returned a verdict of guilty against defendant and a verdict of not guilty against Smith. On June 22, 1995, the District Court denied defendant's motion for a new trial.
 
 
 11
 On September 29, 1995, the District Court sentenced defendant to a term of 240 months, followed by five years of supervised release; although the sentencing range for defendant under the Federal Sentencing Guidelines was 360 months to life imprisonment, the statutory maximum sentence for his crime was twenty years. See 21 U.S.C. § 841(b)(1)(C). Defendant then filed the first of these consolidated appeals, assailing his conviction and sentence.
 
 
 12
 On July 9, 1996, defendant filed before the District Court a motion for new trial based on newly discovered evidence. Defendant submitted the affidavits of Toudle and Green, in which they asserted that defendant had not provided drugs to either of them, that they never had seen him with a weapon, and that their intent at trial had been to testify against Gilmore and Thorn. Each also stated that "I have been a user of drugs and that the use of those drugs affected my memory and testimony." On August 5, 1996, the District Court issued an order denying this motion. Defendant then filed the second of these consolidated appeals.
 
 II.
 
 13
 Defendant contests the admission of the shotgun into evidence, arguing that the government failed to authenticate the weapon. We review challenges to authenticity by deciding whether the district court abused its discretion by admitting the evidence. See United States v. Hatfield, 815 F.2d 1068, 1074 n. 4 (6th Cir.1987); see also United States v. Moreno, 933 F.2d 362, 375 (6th Cir.1991) (appellate courts generally reverse evidentiary rulings only upon a "clear showing of abuse of discretion"). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED.R.EVID. 901(a). Further, evidence may be authenticated through the testimony of a witness with knowledge "that a matter is what it is claimed to be." FED.R.EVID. 901(b)(1). Gilmore and Thorn both described the gun and identified the shotgun admitted into evidence as the same shotgun which defendant had Smith bring to him in Aliquippa. See id. at 131, 154, 226-27. Given the consistent testimony of two witnesses with knowledge, the District Court did not abuse its discretion by finding that enough evidence supported a finding that the shotgun was what the government claimed it to be. Although defendant argues that Thorn and Gilmore are not credible and stresses that the police did not find the gun during their initial search, the District Court accurately noted that these claims address the weight of the exhibit and were for the jury to decide.
 
 
 14
 Defendant next claims that the District Court erred by basing his sentence upon a finding that he was responsible for the distribution of at least 680 grams of crack cocaine. The District Court determined that, at a minimum, defendant made three trips a month to buy crack between April and December of 1994, and brought back at least one ounce on every trip. Having calculated that defendant bought three ounces a month for an eight month period, the District Court concluded that defendant was responsible for approximately twenty-four ounces, or 680 grams, of crack cocaine.[1]
 
 
 15
 We review a finding regarding the amount of drugs attributable to a defendant for clear error. United States v. Mahaffey, 53 F.3d 128, 133 (6th Cir.1995). The government must prove the amount of drugs by a preponderance of the evidence, and the findings of the district court must have "some minimum indicium of reliability." See id. (quoting United States v. Moss, 9 F.3d 543, 553 (6th Cir.1993)). Although a court may estimate the drug amount attributable to a defendant when it is impossible to determine the exact amount, see United States v. Ward, 68 F.3d 146, 149 (6th Cir.1995), cert. denied, 116 S.Ct. 1028 (1996), the court must err on the side of caution "when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity." United States v. Walton, 908 F.2d 1289, 1302 (6th Cir.1990). An approximation is not clearly erroneous if competent evidence in the record supports it. See Ward, 68 F.3d at 149.
 
 
 16
 Although defendant notes that Thorn and Gilmore did not testify with absolute consistency, and that the failure of the police to document his drug activities until November of 1994 is some evidence that he sold less than 680 grams of crack, these claims do not dictate that the findings of the District Court were clearly erroneous. The record is replete with testimony by Thorn and Gilmore that defendant sold drugs in quantities which equal or far exceed the monthly estimate of the District Court. See J.A. at 111-12, 117, 122, 149, 157, 186-87, 195. This case therefore is unlike the Walton case, in which there was no evidence that the defendants had maintained a certain level of drug activity for twenty-six months. See Walton, 908 F.2d at 1302-03. In contrast to the record in Walton, the record in this case reveals that at least two knowledgeable witnesses testified that defendant maintained a generally consistent level of drug activity for the entire time period at issue. The estimations of the District Court, based upon this testimony, were not clearly erroneous.
 
 
 17
 Defendant further appeals the two-level enhancement of his sentence under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon during the drug offense of conviction. The District Court applied § 2D1.1(b)(1) after finding that defendant possessed a firearm in connection with the drug conspiracy because credible testimony at trial indicated that he possessed a shotgun during the trip in December, 1994 from Pennsylvania to Steubenville, that he brought this gun with him into the crack house, and that the police later found the gun in that location. See J.A. at 22-23.
 
 
 18
 In order to secure an enhancement under § 2D1.1(b)(1), the government must prove "(1) that the defendant 'possessed' the weapon, and (2) that such possession was during the commission of the offense." United States v. Tisdale, 952 F.2d 934, 937 (6th Cir.1992) (quoting United States v. Sanchez, 928 F.2d 1450, 1460 (6th Cir.1991)). "Possession 'during the commission of the offense' may be found if the firearm 'could have facilitated [the] illegal [drug] transactions.' " Id. (quoting United States v. Snyder, 913 F.2d 300, 304 (6th Cir.1990)). Once the government carries its burden, a defendant can avoid enhancement only by showing that "it was clearly improbable that the weapon was connected with the offense." United States v. Cochran, 14 F.3d 1128, 1132 (6th Cir.1994) (quoting United States v. Duncan, 918 F.2d 647, 651 (6th Cir.1990)). As with any other sentencing decision, we review the factual findings upon which a § 2D1.1(b)(1) enhancement is based under a "clearly erroneous" standard. See United States v. Sivils, 960 F.2d 587, 596 (6th Cir.1992).
 
 
 19
 The finding by the District Court that defendant possessed a dangerous weapon while furthering the drug conspiracy is not clearly erroneous. The objections mounted by defendant all focus on the particular moment when the police eventually took possession of the shotgun. Regardless of the circumstances in which the police found the gun, the fact remains that two witnesses stated that he possessed a gun during a trip taken to procure drugs in Pennsylvania, brought the gun back to his crack house in Ohio, and announced that the gun was for protection during his drug dealings. Given the above testimony, the determination of the District Court is not clearly erroneous, nor is it clearly improbable that the shotgun was connected with the offense of conspiracy to distribute.
 
 
 20
 Finally, defendant appeals the two-level enhancement of his sentence under U.S.S.G. § 3B1.1, which the District Court based upon a finding that he was a leader or organizer of the conspiracy. Defendant asserts that Gilmore, rather than he, led and organized the conspiracy. Regardless of the merits of this claim, however, we find that, even if the District Court did err by enhancing the sentence of defendant on the basis of his role in the offense, any error was harmless and remand therefore would be futile.
 
 
 21
 If defendant prevailed on his current claim, his offense level would drop from 40 to 38. Because his criminal history category is V, however, application of the sentencing table reveals that his sentencing range nonetheless would remain at 360 months to life, see U.S.S.G. Sentencing Table, a range still at least 120 months longer than the statutory maximum sentence of twenty years for his crime of conviction. See 21 U.S.C. § 841(b)(1)(C). Accordingly, correction of the allegedly mistaken enhancement of his offense level based upon his role in the offense would have no impact upon his sentence and therefore would constitute harmless error under FED.R.CRIM.P. 52(a). See United States v. Gonzalez-Balderas, 11 F.3d 1218, 1225 (5th Cir.1994); United States v. Ivory, 11 F.3d 1411, 1413 (7th Cir.1993); United Staes v. Rodriguez-Razo, 962 F.2d 1418, 1420 (9th Cir.1992); cf. Williams v. United States, 503 U.S. 193, 203 (1992) (if district court misapplied sentencing guidelines, appellate court should remand unless it concludes under harmless error doctrine that district court would have imposed the same sentence if it had applied the guidelines properly).
 
 III.
 
 22
 Defendant argues that he must receive another trial because two of the witnesses for the government, Tamara Toudle and William Green, have recanted their trial testimony in an affidavit. He concludes that the District Court erred by refusing to grant his motion for a new trial. Alternatively, defendant asserts that the District Court erred by refusing to hold a hearing on the motion.
 
 
 23
 A district court has discretion when deciding whether to grant or deny a motion for a new trial under FED.R.CRIM.P. 33. See, e.g., United States v. Glover, 21 F.3d 133, 138 (6th Cir.1994). We therefore will reverse only for a clear abuse of discretion. See United States v. Pierce, 62 F.3d 818, 823 (6th Cir.1995), cert. denied, 116 S.Ct. 965 (1996). A defendant requesting a new trial must demonstrate the following:
 
 
 24
 (1) the evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal.
 
 
 25
 Glover, 21 F.3d at 138 (quoting United States v. O'Dell, 805 F.2d 637, 640 (6th Cir.1986)). District Courts should grant such motions sparingly and with caution. See United States v. Turner, 995 F.2d 1357, 1364 (6th Cir.1993); see also Glover, 21 F.3d at 138 (noting that motions for a new trial based on newly discovered evidence are "disfavored"). Further, "[r]ecanting affidavits and witnesses are viewed with extreme suspicion." United States v. Chambers, 944 F.2d 1253, 1264 (6th Cir.1991). When a new trial motion relies upon the affidavit of a recanting witness, "the first test to be applied by the judge is whether the court is reasonably well satisfied that the prior testimony is false." Id. (quoting United States v. Kearney, 682 F.2d 214, 220 (D.C.Cir.1982)).
 
 
 26
 A district court also has discretion when determining whether to hold an evidentiary hearing before deciding a motion for a new trial. See United States v. Anderson, 76 F.3d 685, 692 (6th Cir.), cert. denied, 117 S.Ct. 91 (1996). A hearing is more appropriate when the verdict already is one of "questionable validity." See O'Dell, 805 F.2d at 643. A hearing is less necessary, however, when the district court already has observed and assessed a recanting witness during the trial. See Kearney, 682 F.2d at 219.
 
 
 27
 The recanting statements of Toudle and Green are extremely similar, although not precisely identical, to each other. The entire recanting statement of Tamara Toudle asserts the following:
 
 
 28
 I, Tamara Toudles [sic], do hereby provide this statement that I did not intend to testify against [defendant] and that the purpose of my testimony was to testify against Patrice Gilmore and Salenna [sic] Thorn. [Defendant] did not provide me with any drugs nor did I ever see [defendant] with any weapons. I further state that I have been a user of drugs and that the use of those drugs affected my memory and testimony.
 
 
 29
 After reviewing the recanting statements, the District Court found in part that they failed to demonstrate either that the trial testimony of Toudle and Green had been false or that the jury would have acquitted defendant if it had heard the new evidence. For the reasons that follow, we find that the District Court did not abuse its discretion by concluding that these recantations required neither a new trial nor an evidentiary hearing.
 
 
 30
 First, the claim by Toudle and Green that they did not intend to testify against defendant is, standing alone, meaningless. Regardless of who Toudle and Green subjectively desired to testify against, their testimony at trial in fact implicated defendant explicitly, and their affidavits must demonstrate with some degree of specificity why the facts to which they testified are actually untrue.[2] Second, the assertions by Green and Toudle that they never saw defendant with any weapons cannot undermine their prior testimony because they never testified at trial to the contrary.
 
 
 31
 Accordingly, the only statements in the recanting affidavits which possibly could contradict or weaken the prior testimony of Toudle and Green are the claims that defendant never provided them with drugs and that the use of drugs affected their ability to remember and testify at trial. The claims that defendant never provided them with drugs, however, do not constitute broad challenges to the overall evidence introduced at trial: Toudle testified that defendant supplied her with drugs on only one occasion, see J.A. at 170-71, and Green testified that defendant sold him drugs "once or twice." See id. at 169. Toudle and Green therefore are recanting very little. The testimony of Thorn and Gilmore, which provided extensive evidence of defendant's guilt, overwhelms these recantations in depth and detail and corroborates the trial testimony of Green and Toudle. The other evidence introduced at trial therefore supports the findings by the District Court that it was the trial testimony of Green and Toudle which was truthful, and that these recantations would not alter the verdict.
 
 
 32
 The vague recantations further fail to explain how Toudle, who testified in detail about the overall conspiracy, misunderstood and misrepresented at trial one particular facet of that conspiracy: the role of defendant. Cf. Kearney, 682 F.2d at 220 (upholding denial of new trial request based on a recanting witness in part because conclusory affidavit of witness failed to explain how he "had learned of all the intricate details surrounding the crime unless he had personally observed them as he testified at trial"). Moreover, Toudle testified that she witnessed defendant furthering the drug conspiracy in ways other than merely supplying her with drugs. For example, she testified that she saw defendant preparing crack for sale, counting drug funds, and selling crack from her own house. See J.A. at 172-74. Toudle, however, does not assert now that she never saw defendant involved in any drug activities; rather, she only makes the very narrow claim that defendant never provided her with drugs. Her failure to recant her entire testimony undermines both the trustworthiness of her recantation and the likelihood that it would result in a different verdict.
 
 
 33
 As noted, Toudle and Green claim that drug use impaired their ability to remember and testify accurately about the activities of defendant. The District Court, however, reasonably concluded that Toudle and Green failed to explain why their current memories regarding the incidents at issue are, in contrast to the memories recalled at trial, accurate and trustworthy. Even if drug use prevented Toudle and Green from possessing accurate memories of particular incidents at the time of trial, then drug use likely has rendered their memories of those incidents generally untrustworthy, regardless of when they articulate those memories. Accordingly, although drug use may be a reason to suspect any recollections offered by Toudle and Green, it is not a compelling reason to accept their current testimony but reject their trial testimony.
 
 
 34
 Given the lack of detail supporting the recantations, the facts which contradict them, the ability of the District Court to assess the witnesses at trial, and the other evidence of defendant's guilt, the District Court did not err by refusing to disbelieve the trial testimony of Toudle and Green, or by finding that the new evidence would not have produced a different verdict.
 
 
 35
 Finally, the District Court did not abuse its discretion by declining to hold an evidentiary hearing. First, the District Court was particularly able to assess the need for a hearing because it personally heard the trial testimony of Toudle and Green. See Kearney, 682 F.2d at 219. Second, the existence of considerable evidence at trial implicating defendant as a drug conspirator, including the unrecanted portion of Toudle's testimony, indicates that the guilty verdict is firmly supported and not of questionable validity. See O'Dell, 805 F.2d at 643.
 
 IV.
 
 36
 Accordingly, we AFFIRM the conviction of defendant, his sentence, and the denial of the motion for a new trial.
 
 
 
 [1]
 There are approximately 28.35 grams in an ounce. See U.S.S.G. § 2D1.1, comment. (n. 10)
 
 
 [2]
 The District Court described the claims by Green and Toudle regarding their intent as "fantastic." Given the fact that defendant was present at the defense table throughout the trial, the District Court did not abuse its discretion by disbelieving the claims of Green and Toudle regarding their intent. Indeed, the record reveals that Toudle concluded her direct testimony by identifying defendant, her cousin, by pointing to him in the courtroom and describing his appearance. See J.A. at 180-81